# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| In re:<br><br>ERIC A. BEARD,<br><br>　　　　　　Debtor | Chapter 13<br>Case No. 19-11823-JEB |

## MEMORANDUM OF DECISION

This matter came before the Court on the Objection to Debtor's Claim of Homestead Exemption Under Mass. Gen. Laws ch. 188, § 3 ("Objection") filed by Metropolitan Life Insurance Company ("MetLife"). MetLife is an unsecured creditor of the debtor, Eric A. Beard, holding a judgment for unjust enrichment. Pursuant to the Objection, MetLife alleges that the Debtor's homestead exemption in 5 Waban Street, Natick, MA ("Property") should be reduced under Section 522(o) of the Code. MetLife asserts that the Debtor spent nonexempt cash with the intent to hinder, delay or defraud MetLife to make improvements that increased the value of his interest in the Property. For the reasons set forth below, the Court finds that MetLife failed to sustain its burden of proof and the Objection will be overruled.

This Memorandum of Decision constitutes the findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a), made applicable to this proceeding by Fed. R. Bankr. P. 7052. The findings set forth in this Memorandum are based on the record as a whole and may be supported by testimony and exhibits that are not specifically cited. Any finding of fact deemed a conclusion of law is adopted as such, and vice-versa. Findings of fact may also be set forth in the Analysis section in connection with the application of the law.

## PROCEDURAL BACKGROUND

Prior to the bankruptcy, MetLife commenced litigation ("District Court Litigation") against the Debtor in the United States District Court for the erroneous overpayment of insurance proceeds by MetLife to the Debtor relating to his father's life insurance policy. The District Court issued a decision ("District Court Decision") on February 7, 2019, that the Debtor was unjustly enriched by retaining a portion of the overpayment and entered a judgment in favor of MetLife in the amount of $217,000.

The Debtor commenced this Chapter 13 case on May 29, 2019. In his Schedules, the Debtor scheduled the Property as an asset. The Debtor owns the Property as a tenant by the entirety with his spouse, Samantha Beard. The Debtor claimed a homestead exemption ("Homestead") in the Property under Massachusetts law in the amount of $292,316.47.

MetLife filed the Objection and an objection to the confirmation of the Debtor's Chapter 13 plan. MetLife objected to the Homestead on the grounds that its judgment was exempt under Massachusetts law, which exempts a homestead from a judgment based on mistake. *See* Mass. Gen. Laws ch. 188, § 3(b)(6). In the alternative, MetLife objected under Section 522(o) of the Code. MetLife alleged that the Debtor used nonexempt cash to make improvements that increased the value of the Homestead. MetLife argued that the cash payments were made with the intent to hinder, delay, or defraud MetLife.

After completing discovery, the Debtor filed a motion for summary judgment. Although the Court denied the summary judgment motion, at the hearing the Court overruled the Objection to the extent that it was based on the state law exception for a judgment based on mistake. The Court ruled that the Bankruptcy Code pre-empted the application of any such exception. *See In re Weinstein*, 164 F.3d 677, 679 (1st Cir. 1999). However, the Court concluded that there were

genuinely disputed issues of material fact that precluded summary judgment on the remaining issues.

The Court conducted an evidentiary hearing on the issue of whether Section 522(o) required the amount of the Homestead to be reduced. Prior to the hearing, the parties submitted a Joint Pretrial Memorandum which set forth stipulated facts. After trial, the parties submitted proposed findings of fact and conclusions of law.

**JURISDICTION**

This Court has jurisdiction over the Objection since it arises under Section 522(o) of the Bankruptcy Code. 11 U.S.C. § 522(o). Pursuant to Section 1334(b) of Title 28, the district courts have jurisdiction of "all civil proceedings arising under title 11, or arising in or related to cases under title 11," subject to exceptions not applicable here. 28 U.S.C. § 1334(b). By a standing order of reference in accordance with 28 U.S.C. § 157(a), the district court in this district has referred all cases under Title 11 and any proceedings arising under, arising in, or related to cases under title 11, to the bankruptcy court. *See* 28 U.S.C. § 157(a). Objections to claims of exemption are core proceedings in bankruptcy. 28 U.S.C. § 157(b)(2)(B). Accordingly, this Court may hear and finally determine this matter.

**APPLICABLE LAW AND BURDEN OF PROOF**

Pursuant to the Objection, MetLife seeks to limit the amount of the Debtor's homestead exemption pursuant to Section 522(o) of the Code. Under Section 522(o), the value of a homestead will be reduced to the extent the value is "attributable" to nonexempt property the debtor disposed of with the intent to hinder, delay, or defraud a creditor within the prior ten years. 11 U.S.C. § 522(o). The burden of proof is on MetLife as the party objecting to the claim of exemption. Fed. R. Bankr. P. 4003(c). To prevail, MetLife must show by a preponderance of

the evidence:

> (1) the debtor disposed of property within the 10 years preceding the bankruptcy filing; (2) the property that the debtor disposed of was nonexempt; (3) some of the proceeds from the sale of the nonexempt property were used to buy a new homestead, improve an existing homestead, or reduce the debt associated with an existing homestead; and (4) the debtor disposed of the nonexempt property with the intent to hinder, delay or defraud a creditor.

*In re Corbett*, 478 B.R. 62, 69 (Bankr. D. Mass. 2012); *see also In re Smither*, 542 B.R. 39, 49 (Bankr. D. Mass. 2015); *In re Presto*, 376 B.R. 554, 568 (Bankr. S.D.Tex. 2007).

Under Section 522(o), the amount of a homestead exemption is reduced only to the extent of the increase in value due to the transfers. *See Smither*, 542 B.R. at 49. Value is defined as fair market value for purposes of Section 522. 11 U.S.C. § 522(a)(2). An objecting party bears the burden of establishing the fair market value of a homestead and the change in value. *Presto*, 376 B.R. at 572. The court must determine the fair market value of the property before and after any transfers, which may differ from the amount of the transfers. *In re Crabtree*, 562 B.R. 749, 753–54 (B.A.P. 8th Cir. 2017). "The amount the debtor spent on the improvements is relevant only to the extent an appraiser might take it into account in valuing the homestead with the improvements." *Id*. Consequently, in addition to the other elements, MetLife bears the burden to establish the fair market value of the Property before and after any transfers made with fraudulent intent as to MetLife.

**FINDINGS OF FACT**

The following findings of fact are based on the testimony of the two witnesses at trial, the Debtor and Samantha Beard, the exhibits submitted at trial, and the agreed upon facts in the joint pretrial memorandum. The Court has not included background facts that are not relevant to this decision. The Court has also not reconciled minor discrepancies, unless material or relevant to

the rulings.

### The Overpayment and Notifications

The Debtor's father, Paul Beard, who had been a federal employee, passed away from natural causes on November 12, 2015. On November 23, 2015, the Debtor, as his father's sole beneficiary, filed a claim with MetLife for benefits under the Federal Employees' Group Life Insurance Policy, setting forth accurate information on his date of death.

On December 7, 2015, MetLife paid the Debtor $362,123.99 on the claim under the policy. Due to an error by his father's employer, MetLife mistakenly overpaid the amount due under the policy by $290,000.00.

At the time the Debtor received the payment, he was unaware that this was an overpayment and had no reason to believe it was. After receiving the payment, the Debtor and his wife began renovations of the Property.

MetLife learned of the mistaken overpayment in February 2016. On March 4, 2016, MetLife left the Debtor a voicemail message on his cell phone regarding the overpayment. The Debtor ignored this voicemail. No evidence was submitted of the content of this voicemail message. In view of the lack of evidence, MetLife has failed to establish that this voicemail message notified the Debtor of the amount of any overpayment or that MetLife was demanding the return of the overpayment.

On March 7, 2016, MetLife sent the Debtor a letter concerning the overpayment. The letter informed the Debtor that he had been overpaid and requested reimbursement of the overpayment. The letter contained inaccurate information on the amount of the overpayment, failing to credit the Debtor for an additional $10,000 to which he was entitled. The letter asked the Debtor to send a check or money order for $300,102.76 to MetLife, despite the fact the

overpayment was only $290,000. The letter included no attachments or other documentation evidencing the overpayment.

Although the letter requested that the Debtor return the payment, the letter did not state that the Debtor was obligated to repay MetLife or state the basis for any legal obligation for repayment. The letter did not state that MetLife would sue to enforce any obligation to repay. The only consequence referenced in the letter was "a possible referral to our Law Department." Exhibit 9.

The Debtor received the letter, but the precise date on which he received the letter is not in evidence. There is no evidence that the letter was sent in hand on March 7, 2016, or that it was sent by overnight mail or other express service from MetLife's offices in Scranton, Pennsylvania to the Debtor in Natick, Massachusetts. In the District Court Decision, the District Court found that the Debtor was notified of the overpayment in March 2016, but did not making a specific finding on the date of such notice. The parties have stipulated to the fact that the Debtor made certain withdrawals from his bank accounts "following verbal and written notices of overpayment." The earliest of the itemized withdrawals occurred on March 11, 2016. Based on these agreed facts, the Court finds that the Debtor received the letter from MetLife no later than March 11, 2016, before the withdrawal on that date. Given the lack of any evidence that the letter was received earlier, the Court finds that the Debtor was not on notice until March 11, 2016, of the specific amount of the overpayment or the request that he return $300,102.76.

After receiving the letter, the Debtor consulted with the attorney he was working with at the time. The date of this consultation is not in evidence. The Debtor testified that the attorney merely told him to "[k]eep doing what you're doing" and "[d]on't worry about it." Transcript, p. 61. The Debtor testified that the attorney was aware the Debtor was performing renovations at

the Property.

After conferring with his attorney, the Debtor did not call MetLife to investigate the matter further. On March 28, 2016, MetLife left another voicemail on the Debtor's cell phone concerning the overpayment. The content of the second voicemail is not in evidence. The Debtor did not return the call.

### District Court Litigation

In the fall of 2016, MetLife commenced the District Court Litigation against the Debtor. Although the date MetLife commenced the action is not in evidence, there is reference to a waiver of service of the complaint in the litigation dated October 24, 2016, in the exhibits. There is no evidence of any further letters, calls, or collection activity by MetLife after the voicemail on March 28, 2016, until Met Life commenced the District Court Litigation.

In the District Court Litigation, although it raised other theories in the complaint, MetLife proceeded to trial solely on the issue of unjust enrichment. As discussed in the District Court Decision, unjust enrichment is an equitable remedy where the court must consider the equities as to whether one person has been unjustly enriched to the detriment of another. In considering whether retention of a payment is unjust, the courts consider whether the recipient reasonably relied on the payment. Based on the evidence, the District Court held that the Debtor was an innocent recipient of the payment initially, since he had no knowledge of the overpayment. The District Court found that the Debtor did reasonably rely on the payment when commencing the renovations. However, declining to credit the Debtor's testimony that he did not receive notice, the District Court found that the Debtor was notified in March 2016 regarding the overpayment. The District Court held that the Debtor could no longer reasonably rely on the payment for the renovations after he received notice of the overpayment. Based on its findings, the District Court

held that judgment should enter for MetLife against the Debtor in the amount of $217,000,

representing the approximate balance in the Debtor's bank accounts in mid-March 2016.

### The Property and the Renovations

The Debtor and his wife, Samantha Beard, purchased the Property from his wife's father

in January 2005. The Property had been his wife's childhood home. They purchased the Property

for $250,000, with a promise to pay an additional $70,000 to his father-in-law for the Property at

a later date. The agreement to pay the additional $70,000 was an oral agreement. No evidence of

a mortgage, recorded or unrecorded, was submitted. Based on the evidence, the Court finds that

the Debtor's debt to his father-in-law was an unsecured debt.

The Debtor recorded a declaration of homestead on the Property on February 1, 2005. On

November 11, 2016, the Debtor filed a second homestead declaration.

As mentioned earlier, upon receiving the check from MetLife in December 2015, the

Debtor and his wife decided to use some of the funds to make much-needed repairs and

improvements to the Property. The parties stipulated that the house was in dilapidated condition

when the Debtor received the payment. The house was 115 years old and in need of repairs,

including plumbing, structural support, flooring, electrical wiring, and roofing. The Debtor

testified that the house was in significant disrepair, including water leaks that resulted in mold

and mildew, electrical issues, and holes in the flooring. His wife testified that prior to the

renovations their daughter suffered from pneumonia several times due to water leaks and mold.

The Debtor's wife, Samantha Beard, testified that she was primarily responsible for

handling the renovations, working with the contractors and subcontractors, and making the

payments. The exhibits reflect that many of the proposals and checks were signed by Samantha

Beard. The Debtor testified that he was significantly depressed as a result of grief over his

father's death. His wife also testified that the Debtor was withdrawn and was "in no frame of

mind" to take the lead on the renovations. Transcript, p. 78. No evidence was submitted to rebut

the testimony or demonstrate that the Debtor took an active role with respect to the renovations.

Given the foregoing, the Court finds that Samantha Beard was the person primarily responsible

for contracting for the renovations and making the payments.

The renovations were extensive and occurred over an extended period from

December 2015 through September 2016. The parties agreed that without the overpayment, the

Debtor and his wife could not afford the renovations.

The parties agreed that construction was underway before the Debtor was notified of the

overpayment. Specifically, "[t]he walls in the downstairs of the home were all removed down to

the studs. There was no refrigerator, stove, washing machine or clothes dryer. The bulk of the

money was already committed to the contractors." Agreed Facts, ¶ 38. The Debtor and his wife

engaged several contractors and subcontractors to perform the work, in addition to making direct

payments for supplies. Payments to contractors, subcontractors, and for supplies were made both

before and after the notification of the overpayment.

The Debtor had two checking accounts at Middlesex Savings Bank: (i) an individual

bank account, and (ii) a joint account with his wife, Samantha Beard. Each of the accounts was

tied to a savings account. Samantha Beard had authority to sign checks and make transfers from

the joint account. Although the parties stipulated that all payments for the renovations were made

by check, as noted below, several payments to contractors were not in evidence.

The principal renovations and payments are discussed below.

**1.      Robert Evans Jr. Contracting**

The Debtor received a proposal dated December 11, 2015, from Robert Evans Jr.

Contracting to perform work on the roof for $9,800, with payment due upon completion of the

work. Although there is no evidence indicating when the work was done, the Debtor testified that

the roof was the first project undertaken. Samantha Beard paid $9,800 for the work by check

dated December 28, 2015. Since the proposal required payment upon completion, the Court finds

that the work was completed prior to December 28, 2015.

### 2.      CBM3 and Sons Home Improvements

Commencing in January 2016, the Debtor and his wife retained a general contractor,

CBM3 and Sons Home Improvements, a dba of Carl "Chip" Malcom ("CBM3"), to perform

work on the Property. The work was described in three different proposals which were submitted

by CBM3 to the "Beard Family." The first proposal dated January 19, 2016, for $12,100, was for

structural work relating to the second floor, including walls and sheetrock, doors, and renovation

of a bathroom. The second proposal dated March 3, 2016, with an initial estimate of $35,170,

was for gutting and remodeling the first floor, including the kitchen, backroom, playroom, and

bathroom. The initial invoice showed a $2,500 credit for "floor install", however, the final

invoice for this contract deleted that item and totaled $37,670. The third proposal dated

May 12, 2016, in the amount of $16,650, was for remodeling of the attic and living room. The

payments for the work overlapped.

The first two contracts required a 50 percent deposit upon signing, 35 percent in week

three of the project, and 15 percent upon completion. The third proposal did not contain terms of

payment. Samantha Beard signed the first contract. Although the signed second and third

contracts were not in evidence, based on the record of payments and the testimony, the Court

finds that the Beards accepted the terms of these contracts.

The Court finds that by March 11, 2016, payments totaling at least $12,000 were made

with respect to the first contract. The Debtor made an initial payment of $5,300 dated February 5, 2016, to Chip Malcom, the sole proprietor of CBM3, which was returned for insufficient funds. According to the Debtor's bank records, the Debtor made a cash withdrawal in the amount of $5,430 on February 12, 2016. Based on this record and the subsequent payments, the Court finds that the first payment under the contract was made. The Debtor made a $3,000 payment to CBM3 on March 3, 2016, from his personal account. Based on the notation on the check stating "#2 for bath," the Court finds that this was the second payment on this contract. The Debtor made a payment by check dated March 8, 2016, in the amount of $3,700, with a notation that states "bathroom balance." Based on the foregoing, the Court finds that this represented the final payment on this contract.

The Court finds that the work under the first contract had been completed by March 8, 2016. As reflected above, the final payment was due upon completion of the work. In the agreed facts, the parties stipulated that because of the renovations, the family was required to live on the second floor and share bedrooms. Accordingly, the Court finds that the completion of the second-floor bathroom and related work was finished before beginning the second contract requiring the gutting of the first floor.

The Court finds that work on the second contract regarding the gutting and remodeling of the first floor commenced promptly after March 3, 2016. By check dated March 3, 2016, the Debtor made the initial payment of $18,000 which was due on signing. The parties stipulated that the repairs were underway prior to receipt of the letter from MetLife. Specifically, "the walls in the downstairs of the home were all removed down to the studs. There was no refrigerator, stove, washing machine or clothes dryer." Agreed Facts, ¶ 38. Based on this evidence, the Court finds that work on the second contract began before March 11, 2016.

The Court finds that the work on the third contract commenced on or after May 16, 2016. Samantha Beard made a payment of $6,500 by check dated May 16, 2016. The check bore the notation, "Dep. additional, liv & attic."

Based on the evidence, the Court finds that the Debtor or his wife Samantha Beard made payments totaling $65,425 to CBM3. Of this amount, payments totaling $30,000 were made prior to March 11, 2016, and payments totaling $35,425 were made after that date, as listed below. The total amount due under the invoices was $66,420, which is $995 greater than the total of the payments in evidence.

| Date | Amount | Account | Signatory | Comment |
|------|--------|---------|-----------|---------|
| Prior to 3/3/16 | $5,300.00 | Not in evidence | Not in evidence. | |
| 3/3/16 | $3,000.00 | Debtor account | Debtor | Check Notation: #2 Bath |
| 3/3/16 | $18,000.00 | Debtor account | Debtor | Check Notation: Construction |
| 3/8/16 | $3,700.00 | Debtor account | Debtor | Check Notation: Bath Balance |
| 4/30/16 | $10,000.00 | Joint Account | Samantha Beard | Check Notation: Second Payment |
| 5/16/16 | $6,500.00 | Joint Account | Samantha Beard | Check Notation: Dep. additional, liv & attic |
| 6/5/16 | $6,000.00 | Joint Account | Samantha Beard | None |
| 6/24/16 | $7,000.00 | Joint Account | Samantha Beard | Check Notation: Payment 5 |
| 7/10/16 | $2,000.00 | Joint Account | Samantha Beard | Check Notation: Tile work and wood floors |
| 7/21/16 | $3,925.00 | Joint Account | Debtor | Check Notation: Final Additionals |

### 3.   D.H. MacLeod Plumbing & Heating

As part of the renovations, the Debtor and his wife hired a plumbing contractor, D.H.

MacLeod Plumbing & Heating ("MacLeod"). MacLeod made a proposal dated January 19, 2016, to provide plumbing for the second-floor bathroom for $4,200, and for the first-floor kitchen and bath for $6,000, in both cases exclusive of fixtures. Samantha Beard accepted the proposal on January 19, 2016.

Based on text messages with CBM3 included in Exhibit 12, the work on the second-floor bathroom was scheduled for February 15, 2016. Based on the findings above with respect to CBM3's work, the Court finds that MacLeod's work on the second-floor bathroom was completed before March 11, 2016.

The Court finds that the Debtor or his wife Samantha Beard made payments totaling $24,668.13 to MacLeod, including a payment of $3,637.45 made prior to March 11, 2016, and payments totaling $21,030.68 made after that date as listed below. The final payment of $12,007.05 was paid by check, however, the check number is not consistent with the check numbers in the Debtor's bank accounts. The amount of the check is equal to two withdrawals made on July 29, 2016, one from the Debtor's saving account in the amount of $6,007.05 and one from the joint account in the amount of $6,000. As discussed below, a payment to Leland Siding was made by bank check, with a similar number to the check number shown below. Accordingly, the Court finds that the final payment was made by bank check as detailed below.

| Date | Amount | Account | Signatory | Comment |
|------|--------|---------|-----------|---------|
| 2/21/2016 | $3,637.45 | Debtor account | Debtor | |
| 3/24/2016 | $2,198.88 | Debtor Account | Debtor | Check notes |
| 4/30/2016 | $5,877.80 | Joint Account | Samantha Beard | |
| 6/6/2016 | $529.32 | Joint Account | Samantha Beard | |
| 6/9/2016 | $417.63 | Joint Account | Samantha Beard | |
| 8/2/2016 | $12,007.05 | $6,000 from joint account, | None | Reflects date received by contractor. Payment by bank |

| | | $6,007.05 from Debtor account | | check. |
|---|---|---|---|---|

### 4.        Leland Siding

On February 4, 2016, the Debtor and his wife accepted a contract with Leland Siding to install new siding on the house at a cost of $19,600. The contract required a payment of $2,000 upon signing, $8,000 upon the start of the work, and the balance at completion. The Debtor made a payment of $2,000 on February 6, 2016. His wife made a payment of $8,000 from the joint account by check dated May 2, 2016. Based on this payment and the terms of the contract, the Court finds that the work commenced on or after May 2, 2016. The final payment of $9,400 was made by bank check dated July 28, 2016.

### 5.        Other Suppliers and Contractors for Improvements

The Court finds that the Beards made other payments for supplies or other work resulting in or tied to the improvements as follows. Prior to March 11, 2016, the Debtor or his wife purchased supplies totaling $1,630.20, including $1,375.18 for tile and $255.02 for lighting fixtures. After March 11, 2016, the Debtor or his wife made additional payments totaling $54,430.84 as detailed below. The majority of payments were made by check from the account of the Debtor or the joint account. For certain payments made by credit card, as reflected below, there is no evidence of who was obligated on the account. Since no evidence to the contrary has been provided, the Court finds that the only obligor was the party making the payment.

| Date | Amount | Contractor /Supplier | Payor | Manner Of Payment/ Source Account |
|---|---|---|---|---|
| 4/12/2016 | $4,100.00 | Yale Appliance | Samantha Beard | By check from joint account |
| 4/20/2016 | $1,781.00 | Supply NE | Samantha Beard | By check from joint account |
| 4/25/2016 | $14,400.00 | Metropolitan Cabinets | Samantha Beard | By check from joint account |

| 5/16/2016 | $700.00 | Tiles Plus More; deposit on purchase of $821.25. | Samantha Beard | By check from joint account |
|---|---|---|---|---|
| 5/24/2016 | $169.89 | Tiles Plus More | Samantha Beard | By debit card from joint checking account |
| 5/27/2016 | $640.95 | Hansen Electric | Samantha Beard | By check from joint account |
| 6/2/2016 | $36.89 | C&T Paints | No evidence | By debit from joint account |
| 6/3/2016 | $587.61 | Hansen Electric | Samantha Beard | By check from joint account |
| 6/3/2016 | $121.25 | Tiles Plus More (balance on 5/16 purchase of $821.25) | Samantha Beard | By credit card. No evidence of the obligor(s) on the credit account. |
| 6/3/2016 | $8,267.74 | Yale Appliance | Samantha Beard | By check from joint account |
| 6/6/2016 | $1,750.00 | Jose Andrade | Samantha Beard | By check from joint account |
| 6/6/2016 | $368.66 | C&T Paints | Samantha Beard | By check from joint account |
| 6/6/2016 | $159.35 | C&T Paints | No evidence | Debit from joint account |
| 6/11/2016 | $1,100.00 | Boston Woodfloors Supply | Samantha Beard | By check from joint account |
| 6/11/2016 | $1,000.00 | Jose Andrade | Samantha Beard | By check from joint account |
| 6/16/2016 | $7,000.00 | Metropolitan Cabinets | Samantha Beard | By check from joint account |
| 6/16/2016 | $3,194.05 | Metropolitan Cabinets | Samantha Beard | By check from joint account |
| 6/17/2016 | $51.80 | Tiles Plus More | Samantha Beard | By prepaid credit card from joint account |
| 6/20/2016 | $2,000.00 | En-R-Gy Saver | Samantha Beard | By check from joint account |
| 6/22/2016 | $41.33 | Tiles Plus More | Samantha Beard | By credit card. No evidence of the obligor(s) on the credit account. |
| 6/30/2016 | $2,275.00 | Jose Andrade | Samantha Beard | By check from joint account |
| 7/6/2016 | $394.83 | Hansen Electric | Samantha Beard | By check from joint account |
| 7/7/2016 | $31.82 | Tiles Plus More | Samantha Beard | By cash |
| 7/8/2016 | $413.47 | Tiles Plus More | Samantha Beard | By check from joint account |

| 7/26/2016 | $73.63 | Tiles Plus More | Samantha Beard | By credit card. No evidence of the obligor(s) on the credit account. |
| 9/15/2016 | $3,771.57 | En-R-Gy Saver | Debtor | By check from sole account |
| **TOTAL** | $54,430.84 | | | |

Although MetLife asserts that other payments to contractors or suppliers were made, it has failed to sustain its burden of proof with respect to these payments. MetLife relies only on statements made in the Debtor's responses to interrogatories in the District Court Litigation or in the agreed facts. The agreed facts identify contractors who made improvements from December 2015 to January 2017, summarizing the type of work that was done. But there is no further detail regarding the timing of the work, the amount paid, or the nature of the purchases. Similarly, in the District Court Litigation, the responses to interrogatories list payments and amounts, but do not state when made or whether the purchases were for the renovations or general supplies. Given the failure of MetLife to provide any other evidence, such as invoices, contracts, or detail regarding these payments, the Court finds that MetLife has failed to meet its burden of proof that the payments were made for improvements after March 11, 2016.

**6.      Summary of Renovation Payments**

In summary, as detailed above, the Court finds that the Debtor and his wife made (i) $47,067 in payments for renovations prior to March 11, 2016, to contractors and suppliers, and (ii) $128,285 in payments after March 11, 2016. Of the payments made after March 11, 2016, the Debtor made only five payments totaling $31,302.50, as detailed below. The balance of the payments was made by Samantha Beard.

| Date | Amount | Contractor | Payor | Manner Of Payment/ Source Account |
|------|--------|-----------|-------|-----------------------------------|
| 3/24/2016 | $2,198.88 | MacLeod Plumbing | Debtor | By check from sole account |
| 7/21/2016 | $3,925.00 | CBM3 | Debtor | By check from sole account |

| 7/28/2016 | $9,400.00 | Leland Siding | Debtor | By bank check purchased with cash withdrawal from joint account |
| 8/2/2016 | $12,007.05 | MacLeod Plumbing | Debtor | By bank check purchased with cash withdrawals from joint and sole accounts in equal parts |
| 9/15/2016 | $3,771.57 | En-R-Gy Saver | Debtor | By check from sole account |
| **TOTAL** | $31,302.50 | | | |

### Cash Payments and Father-In-Law Debt

When they purchased the Property, the Debtor and his wife agreed to pay his father-in-law an additional $70,000 at a later date. After receiving the insurance proceeds, the Debtor repaid his father-in-law $70,000. The payments were made in cash, not by check. The Debtor testified that he made some payments before learning of the overpayment and additional payments after learning of the overpayment. The date and amount of each payment to his father-in-law is not in evidence.

Both before and after the notification of the overpayment, several cash withdrawals each in an amount greater than $1,000 were made from the Beards' bank accounts. The aggregate of these cash withdrawals was (i) $36,430 for the period prior to March 11, 2016, and (ii) $103,643 for the period after March 11, 2016. The Debtor could not recall what the cash was used for and kept no records. Of this amount, $70,000 was used to repay his father-in-law. An additional $30,707 was used for renovations, either for bank checks or to replace a bounced check. The Debtor also testified that he paid approximately $4,500 in cash to have the driveway paved. The balance of the cash payments is not explained.

### Increase in Value Attributable to Expenditures

The Court is unable to make any findings on the change in the fair market value of the Property due to the improvements. The only evidence submitted regarding value related to

property tax assessments. The agreed upon exhibits included a letter from Eric Henderson, who

is the director of assessing for the Town of Natick, Massachusetts. Mr. Henderson's letter

included copies of the Town's property tax records and a spread sheet showing the assessed

valuations of the land and building for fiscal years 2015 through 2018. Based on the records, in

his letter, Mr. Henderson opined that "the improvements made to the property" increased the

assessed value of the Property by $101,400 between Fiscal Year (FY) 2017 and FY 2018.

Mr. Henderson's letter and opinion deal only with the assessed value, not fair market

value. There is no indication or explanation as to how assessed value relates to fair market value.

His opinion fails to provide information to enable the Court to determine the fair market value of

the Property before the improvements or the fair market value after the improvements. Absent

such information, the Court is unable to make a finding regarding the increase in fair market

value due to the improvements.

Mr. Henderson's letter has additional deficiencies. There is no indication of what dates

are being compared for the fiscal year. Although he states the estimate of value was based on the

improvements as permitted, he does not identify which of the improvements were permitted or

considered. He indicates that an external inspection was done, but he does not indicate when or

by whom or what was observed. Mr. Henderson does not indicate that the interior of the home

was inspected at all, much less when, or by whom, or what was observed. He indicates that

between FY 2017 and FY 2018, "adjustments were made to models and algorithms that affected

all properties," but does not indicate how these adjustments affected the comparison. The

property record cards that support the letter are opaque, not self-explanatory, and fail to provide

information to enable the Court to determine value.

For all these reasons, the Court finds that MetLife failed to establish the extent to which

the improvements paid for by the Beards' payments in general, or by the five payments made by the Debtor after March 11, 2016, in particular, increased the fair market value of the Property. Although there was undoubtedly an increase in fair market value, the statute requires that the Court determine the specific increase, by comparing the fair market value before and after the improvements. MetLife has failed to provide evidence to enable the Court to do so.

**ANALYSIS**

As more fully set forth below, MetLife has failed to meet its burden to prevail on an objection to the Homestead under Section 522(o) of the Code. Although MetLife has shown that the Debtor made transfers of nonexempt property within ten years to improve the Property, MetLife failed to show that the transfers were made with the intent to hinder, delay, or defraud MetLife. MetLife has also failed to show the extent of the increase in the fair market value of the Property as a result of the transfers.

**Payments to Improve the Property**

The District Court found, and the parties agreed, that prior to the notification of the overpayment, the Debtor had no reason to believe the payment was improper. As reflected in the findings, the Court finds that the date of that notification was no earlier than March 11, 2016. Consequently, the Court considers only the transfers after that date.

The statute looks to only dispositions by the Debtor. The Debtor made five payments totaling $31,302.50 for improvements after March 11, 2016. Although MetLife argues that the Court should consider transfers totaling $142,231.62, MetLife fails to distinguish between the payments made by the Debtor and those made by his wife. MetLife has offered no reason why the payments made by the Debtor's wife should be treated as dispositions by the Debtor.

Nor, based on the evidence, does the Court find any basis to do so. The Debtor and his

wife both testified, and the Court has found, that Samantha Beard was primarily responsible for dealing with the contractors, making the plans and payments. The exhibits support this finding, showing that Samantha Beard entered into contracts, communicated with the contractors regarding timing and developments, and signed the checks. Both the Debtor and his wife testified that as a result of grief over his father's death, the Debtor was withdrawn and depressed. There was no evidence submitted that showed the Debtor actively participated in the decisions on the renovations, other than making the payments identified.

### Intent to Hinder, Delay, or Defraud a Creditor

Based on the evidence, the Court is unable to find that the Debtor made the transfers with the intent to hinder, delay, or defraud MetLife. The Court finds that the Debtor's intent was to restore the house to habitability, which was a legitimate purpose.

In considering this provision of the statute, courts look to the interpretations under the actual fraud prong of Section 548 dealing with fraudulent transfers. *Corbett*, 478 B.R. at 69. Fraudulent intent is frequently inferred based on circumstantial evidence surrounding the transfer. *Max Sugarman Funeral Home, Inc. v. A.D.B. Invs.*, 926 F.2d 1248, 1254 (1st Cir. 1991); *Consove v. Cohen (In re Roco Corp.)*, 701 F.2d 978, 984 (1st Cir. 1983). The circumstances include (i) whether there is actual or threatened litigation, (ii) transfers of all or substantially all of a debtor's property, (iii) insolvency, and (iv) special relationship with a transferee. *Max Sugarman Funeral Home*, 926 F.2d at 1254-55. "The presence of a single badge of fraud may spur mere suspicion []; the confluence of several can constitute conclusive evidence of an actual intent to defraud, absent 'significantly clear' evidence of a legitimate supervening purpose." *Id.* In addition, the Court must be mindful that facts that support an inference of fraudulent intent might also be consistent with an inference of innocent or legitimate purpose.

*See In re Varrasso*, 37 F.3d 760, 764 (1st Cir. 1994).

The Debtor and his wife sought to complete the renovations that had begun and been far advanced prior to the notice of the overpayment. When they first learned of an alleged overpayment, the first floor had been gutted down to the studs, there was no refrigerator, stove, or washing machine, and the family of five was confined to the second floor. Given the state of disrepair, and the existing contracts, the Debtor and his wife focused on completing the work.

There is no showing that the Debtor was evading MetLife. At the time of these payments, the Debtor was aware that MetLife was asserting that it had made an overpayment and that it had asked him to return the overpayment. But there is no evidence that MetLife was pursuing collection efforts against the Debtor until the Fall of 2016, after the payments were made. MetLife left two voicemails in March and sent one letter. There was no evidence of the content of the voicemails. The letter stated no basis for the claim to the overpayment and included inaccurate information on the amount of overpayment. In addition, the letter did not demand payment or threaten litigation. It stated only that MetLife would "possibly" refer the matter to its law department. The Debtor consulted an attorney who had advised him not to worry about the letter, and he had relied in good faith on this advice. After the last voicemail message was left, there is no evidence of any collection activity by MetLife until it commenced litigation more than six months later. Given the tenor of the letter, the attorney advice, and the lack of any follow up collection activity, the Debtor may have assumed that MetLife had chosen not to pursue the matter.

The Debtor continued to use his existing bank accounts in the same manner he had before being notified of the overpayments. The Debtor's payments included payments to existing creditors, CBM3 and Leland Siding, for debt contracted before the Debtor learned of the alleged

21

overpayment. Without any ongoing collection efforts by MetLife, or other indication of fraudulent intent by the Debtor as to MetLife, payments to pre-existing creditors fail to support a finding that the Debtor made them with intent to hinder, delay, or defraud MetLife.

Although MetLife suggests that the cash withdrawals raise an issue of intent to delay MetLife, it fails to carry its burden. The evidence shows that the Debtor had made such withdrawals both before and after the notice. The evidence also shows that some of the cash, both before and after the notice, was used to pay contractors with bank checks or cash, and to pay his father-in-law on a preexisting debt, which were legitimate purposes.

MetLife also argues that the payments to the father-in-law were evidence of fraud. But MetLife stipulated that the payments were for repayment of an outstanding loan. As reflected in the evidence, the Debtor testified he made payments to his father-in-law both before and after the notification. The payment to an insider on a legitimate debt, without any other evidence of fraudulent intent as to another creditor, is insufficient to suggest there is an ongoing intent to hinder or delay such creditor.

This ruling is not inconsistent with the findings by the District Court. The District Court ruled on whether it was "unfair" for the Debtor to retain the payment. The District Court was required to determine when the Debtor could no longer reasonably rely on the payment to make the renovations. The District Court found that it would be a windfall for the Debtor to retain the remaining funds after receiving notification from MetLife in mid-March. But the District Court made no findings as to the Debtor's intent in making the payments for improvements. The issue of any fraudulent intent by the Debtor as to MetLife was not considered or found by the District Court as part of its rulings.

**Value Attributable to Payments**

As more fully set forth above, MetLife has failed to demonstrate the specific extent to which the transfers increased the fair market value of the Property. MetLife has offered no evidence on the fair market value of the Property before or after the improvements. Instead, it offered only changes in assessed value from one unknown time period to another period. The evidence fails to distinguish how much of the assessed value increase was a result of the improvements made or undertaken prior to the notification, including the roof and second floor improvement, and how much was attributable to the improvements after the notification. It fails to identify what improvements were considered in determining the assessed values. Given the lack of evidence, the Court is unable to make any finding as to the amount of any change in the fair market value of the Property as a result of the improvements.

**CONCLUSION**

For the foregoing reasons, the Court finds that MetLife has failed to sustain its burden of proof that the fair market value of the Debtor's interest in the Property was increased as a result of nonexempt property disposed of by the Debtor with the intent to hinder, delay or defraud MetLife. As the Court previously ruled, the state law exception for a judgment based on mistake is pre-empted by the Bankruptcy Code.

The Court will issue a separate order consistent with this opinion overruling the Objection in its entirety.

Dated: October 15, 2024                                    By the Court,


Janet E. Bostwick
United States Bankruptcy Judge